# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

LINDA M. O.,[1]

               Plaintiff,

v.                                      ACTION NO. 2:21cv126

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Linda M. O. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). She asserts the Administrative Law Judge failed to properly weigh the opinion evidence of the psychological consultative examiner.

      An order of reference assigned this matter to the undersigned. ECF No. 14. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 18) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 21) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.  PROCEDURAL BACKGROUND

Linda M. O. ("plaintiff") protectively filed applications for benefits on June 19, 2015, alleging she became disabled on January 1, 2015, due to bone spurs in her neck, a pulled muscle in her neck, and severe depression.[2]  R. 18, 325, 329, 414.  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an administrative law judge ("ALJ").  R. 118–29, 132–44, 199–200.  ALJ Carol Matula held a hearing on September 27, 2017, and issued a decision denying benefits on April 17, 2018.  R. 72–103, 151–66.  On December 10, 2019, the Appeals Council remanded the case to an ALJ to give further consideration to the medical consultative examiner's opinion, specifically a limitation in reaching with the left arm, and to address any Appointments Clause defect.  R. 168–69.

ALJ Jeffrey Jordan held a remote hearing on July 21, 2020, and issued a decision denying benefits on August 19, 2020.  R. 18–34, 43–70.  On January 7, 2021, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 4–6.  Therefore, ALJ Jordan's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on March 9, 2021. ECF No. 1.  The Commissioner answered on July 16, 2021.  ECF No. 12.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on October 18 and November 17, 2021, respectively.  ECF Nos. 18–19, 21–22.  Plaintiff filed a reply on December 8, 2021.  ECF No. 23.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   **RELEVANT FACTUAL BACKGROUND**

Plaintiff presents one issue on appeal, arguing the ALJ failed to properly weigh the opinion evidence of the psychological consultative examiner.  The Court's review of the facts below is tailored to this argument.

### A.   *Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on July 21, 2020, plaintiff provided the following information. At that time, the 53-year old plaintiff lived in an apartment with her ex-husband and 24-year old son for whom she cooked and cleaned.  R. 48–49, 58–59.  Plaintiff obtained a graduate equivalency degree and some college credit.  R. 48; *see* R. 690 (reporting one year of college credits from community college).

Plaintiff worked part-time (13 to 15 hours per week) performing janitorial services, which she had done for "almost a year" as of July 2020.  R. 50–51.  Plaintiff described vacuuming offices, collecting trash, and cleaning bathrooms.  R. 62–63.  Plaintiff had previous full-time employment with a telemarketing company for approximately 10 years ending in 2013.  R. 51–52.  Her employment there ended when she filed a sexual harassment and discrimination case against the company, which resulted in an out-of-court settlement.  R. 52.  Plaintiff described the case as "the breaking point," that "got [her] down" and was "[v]ery depressing."  R. 53.

Plaintiff indicated that the "biggest medical problem[s]" preventing her from working were her knees, hands, and, "at times," depression, and anxiety.  R. 55.  With respect to mental health issues, plaintiff described having hallucinations and paranoid thoughts every day, seeing and hearing people following her and talking about her when no one was there.  R. 55–56.  She coped with her depression by lying down and trying "to get through it."  R. 56.  She received treatment from a psychiatrist and a therapist.  R. 57–58.  She also testified to having difficulty concentrating,

3

such as an inability to remember what she watched on television causing her to lose interest.  R. 61–62.

### B.    *Hearing Testimony by Vocational Expert*

Linda Augins, a vocational expert ("VE"), testified at the hearing.  R. 44, 64–66.  Based on the ALJ's hypotheticals, VE Augins opined that someone with plaintiff's age, education, work history, and residual functional capacity ("RFC") could not perform plaintiff's past relevant work, but could perform certain unskilled, light jobs in the national economy, such as housekeeping cleaner, garment sorter, and price marker.  R. 64–65.  VE Augins further testified that someone who needed to lie down for two hours during an eight-hour workday, or who would be off-task more than 15% of the workday, would be precluded from work.  R. 67.

### C.    *Relevant Mental Health Treatment*

#### 1.    Hampton/Newport News Community Services Board

##### a.    Russell Lantz, P.A., and Sharon Pilati, L.P.C.

In January 2016, plaintiff was assessed by physician's assistant Russell Lantz and counselor Sharon Pilati with the Hampton/Newport News Community Services Board ("CSB") for treatment of depression.  R. 687–90.  Plaintiff reported feeling depressed for the previous two years, and seeking treatment for the first time.  R. 687, 746.  Plaintiff relayed that she lived with her sister and brother in a townhouse, she was separated from her husband, her 21-year-old son was incarcerated, and her 19-year-old son lived with her sister-in-law, to whom plaintiff owed child support.  R. 688, 690–91, 746; *see* R. 708 (plaintiff reported she had been married for 28 years, separated for two, and hoped to reconcile with her husband).  Plaintiff reported an addiction to crack cocaine for 15 years, which ended 10 years prior.  R. 687.  Several of plaintiff's family members have schizophrenia, including her mother, a sister, a brother (who lives in a home), and

a son. R. 687–88. Plaintiff stated that one of her sisters committed suicide three years ago, that plaintiff had been molested by her older brother when she was five to seven years old, and that she began hearing voices (auditory hallucinations) when she was a teenager. R. 689–90. Plaintiff reported several deaths in her family over the previous two years, that she had started isolating, and that she had difficulty sleeping due to neck pain. R. 689. Plaintiff cleaned houses and did odd jobs to earn income. R. 690. Plaintiff had no prior psychiatric hospitalizations, no prior mental health treatment, and no prior suicide attempts. R. 689.

PA Lantz conducted a mental status examination finding plaintiff exhibited a dysphoric mood and constricted affect, avoided eye contact, and was "not real spontaneous, but did directly answer inquiries." R. 690. Plaintiff was pleasant, calm, cooperative, alert and oriented, with normal speech, no delusions or paranoia, and with linear, coherent, goal-directed thought processes. *Id.* PA Lantz diagnosed schizoaffective disorder, depressed type, and prescribed Seroquel and therapy. R. 689–91.

Plaintiff had two appointments in February and March 2016 with PA Lantz and one therapy session with counselor Pilati. R. 694, 698, 702. Plaintiff continued to exhibit a dysphoric mood and constricted affect, but the remainder of her mental status examination results were normal (normal speech and thought content, okay eye contact, no delusions or paranoia, no abnormal muscle movements, and no suicidal or homicidal ideation). *Id.* Plaintiff reported auditory hallucinations, poor sleep, and okay appetite. R. 694, 698, 703. Plaintiff stopped taking Seroquel due to nightmares. R. 694. She tried Trazadone for sleep, but discontinued the medication because it caused acne. R. 695, 698. PA Lantz prescribed Celexa for depression and recommended that plaintiff continue therapy. R. 695, 699. Counselor Pilati encouraged plaintiff to begin meditation, walking, and developing a regular sleep pattern. R. 703.

5

Plaintiff was incarcerated from March to October 2016. R. 707.

      **b.**      **Peter Smith, M.D.**

In December 2016, plaintiff returned to the Hampton/Newport News CSB for treatment and was evaluated by Peter Smith, M.D. *Id.* Plaintiff's mental status exam revealed plaintiff had a mildly depressed mood, sleep problems, low self-esteem, significant anhedonia, low energy, auditory and visual hallucinations (feels people, who are not there, are watching and judging her), paranoid ideation (although this had been more prominent in the past), and recent difficulties with concentration. R. 708. Plaintiff was well groomed, verbal and cooperative, with good eye contact, a good appetite, no suicidal or homicidal ideas, and no abnormal involuntary movements. R. 708–09. Dr. Smith diagnosed schizoaffective disorder, depressed type, and polysubstance dependence, in sustained remission. R. 709. He prescribed Zoloft (sertraline) and risperidone, and referred plaintiff to therapy. *Id.*

Plaintiff's mental status examination by Dr. Smith in January 2017 revealed some improvement with fair self-esteem, no difficulty concentrating, and improved energy. R. 720. Dr. Smith increased the Zoloft dose to 100 mg, continued risperidone, and added perphenazine. *Id.*

In June 2017, plaintiff reported to Dr. Smith that "therapy has been very helpful," she was making "some progress," and although still depressed, she was improving and "better." R. 735.[3] Plaintiff "reluctantly" acknowledged paranoid ideation and auditory and visual hallucinations

---

[3] Beginning in 2017, for financial reasons, plaintiff obtained her prescriptions for her mental health medications through her primary care physician at the Newport News Free Clinic. R. 735, 759. Plaintiff continued to be treated for her mental health symptoms at the CSB. R. 759. Plaintiff visited the Newport News Free Clinic on six occasions between December 2015 and April 2017 for various issues such as for follow-up after a heart catheterization, to refill medications, and for pain in her neck, back, hip, knees, arm, and wrist. R. 759–60, 763, 767, 771–73, 790, 797. Notations regarding her mental health remained constant: normal judgment and insight, oriented, recent and remote memory intact, and appropriate mood and affect. *Id.* The one exception was on February 24, 2016, when a notation was made indicating plaintiff had a "flat" affect. R. 778.

(vague shadows of people following her and derogatory voices). *Id.* She reported her sleep was improving, her self-esteem was "quite good," and she had no difficulties with energy, concentration, or appetite. *Id.* Dr. Smith continued plaintiff on Zoloft and prescribed aripiprazole. R. 721, 735–36. A trial of risperidone was discontinued due to a rash. R. 726.

### c.       Nerine Pete, L.P.C.

Plaintiff had five therapy sessions with counselor Nerine Pete between February and June 2017. R. 726, 733, 737, 740, 748. Plaintiff explained she had experienced symptoms of depression and anxiety for four years, stating "I was just dedicated to working, and when I stopped working three years ago, I noticed the depression and anxiety." R. 748. Plaintiff reported isolating most days watching television and playing on the Internet, being irritable and sad, having difficulty sleeping, and continuing to hear voices. R. 726, 733, 737, 748. Counselor Pete noted plaintiff's depressed mood and auditory and visual hallucinations. R. 752. Otherwise, her mental status examinations revealed good judgment, average intellectual functioning, no suicidal or homicidal ideation, and other areas assessed within normal limits (behavior, motor disturbance, attitude, orientation, speech, thought content, thought process, memory, consciousness, and insight). R. 733, 737, 740, 752.

### 2.       Norfolk Community Services Board

Following her move from Newport News to Norfolk in late August or early September 2019, plaintiff received mental health treatment from the Norfolk CSB through May 2020 (the most recent treatment notes in the record). R. 913–14, 959. During her September 2019 needs assessment, conducted by counselor Annabella Miano, plaintiff reported that she had recently moved to the Norfolk Union Mission. R. 913–14. She reported symptoms of depression (hopelessness, worthlessness, hypersomnia, trouble concentrating, increased appetite, social

isolation, failure to care for personal hygiene, and a history of suicidal ideation without attempts), mania (racing thoughts, impulsive behaviors such as stealing, rapid mood changes, distractibility, and an inflated self-esteem), auditory and visual hallucinations, anxiety, and panic attacks. R. 914. Counselor Miano conducted a mental status examination and noted plaintiff exhibited a depressed mood, flat affect, and avoided eye contact, and that "mental health symptoms have caused significant impairment in [plaintiff's] social and occupational functioning." R. 918–19.

### a.  Alison McCanon, M.D.

Dr. McCanon treated plaintiff from October 2019 through May 2020, examining plaintiff in person on four occasions, and over the telephone on one occasion due to the COVID pandemic. R. 922–25, 929–30, 932–33, 935, 939–40, 959.  In October 2019, plaintiff reported she was depressed most days with difficulty sleeping some days, had low motivation, and had low self-esteem. R. 922. Plaintiff indicated she obtained part-time employment and had not used opiates in two years. R. 923–24. Following a mental status examination, Dr. McCanon noted plaintiff had poor eye contact, a depressed mood with constricted affect, and reported vague paranoia and auditory hallucinations. R. 924. Plaintiff's PHQ-9 (a nine item, patient-health questionnaire used to assess the severity of a patient's depression) score was 13 indicating moderate depression. R. 922. Dr. McCanon diagnosed other specified depressive disorder, other specified anxiety disorder, and panic disorder, and increased plaintiff's Zoloft dose from 100 to 150 mg. R. 924–25. Dr. McCanon found plaintiff "exhibits deficits in peer relations, and clinical depression having an adverse impact on the ability to participate in employment, educational, [and] social activities," and on "her ability to maintain employment and housing." R. 925.

In November 2019,[4] plaintiff reported that she had moved into an apartment and was continuing to work part-time for a janitorial service which was "going well." R. 929. She stated that Zoloft was helping and she was "pretty good." *Id.* Plaintiff indicated that she was still depressed with low energy and poor concentration, but she was sleeping well, had no panic attacks in the last few months, was walking "a lot," and lost 15 pounds. *Id.* Following a mental status examination, Dr. McCanon noted plaintiff continued to exhibit a depressed mood and constricted affect, that her mood was slightly improved, she had fair eye contact, and reported no perceptual disturbances. *Id.* Dr. McCanon found plaintiff remained stable in the community with her mental illness partially controlled by medication. R. 930. She increased plaintiff's Zoloft dose to 200 mg. *Id.*

In December 2019, stating "I'm good," plaintiff reported remaining mildly depressed but that she was dealing with it. R. 932. She had low energy, poor concentration, auditory hallucinations, and worried a lot but had no panic attacks. *Id.* Her sleep and appetite were good, she continued working part-time, she rented a room in a house through the Second Chances program, and she was volunteering. R. 932, 948–49. Conducting a mental status examination, Dr. McCanon noted plaintiff's depressed mood with constricted affect and auditory hallucinations. R. 932. Otherwise, the examination revealed all normal findings, including fair eye contact,

---

[4] Following her move to Norfolk, on November 18, 2019, plaintiff underwent a comprehensive evaluation to establish primary care with Sentara Internal Medicine Physicians. R. 883–98. Plaintiff's chief complaint was hypertension. R. 883. With respect to plaintiff's mental health, PA Jennifer Potts noted the plaintiff had mild depression, was compliant with medication with no noted side effects, and felt that her depression symptoms were getting better over time and that she has been stable on Zoloft for years. R. 887. On examination, PA Potts found plaintiff had a "depressed mood (stable)," but noted no insomnia, no nervousness, no anxiousness, and a normal mood, affect, behavior, and thought process. R. 888, 891. PA Potts assessed "[c]urrent mild episode of major depressive disorder without prior episode . . . [s]table on current medication," and "schizophrenia, unspecified type . . . [s]table on current management." R. 885. Plaintiff has no further treatment records from Sentara Internal Medicine Physicians.

normal speech, fair insight and judgment, and linear and goal-directed thought process. *Id.* Plaintiff had no side effects from Zoloft and was satisfied with her medication regimen, which Dr. McCanon noted partially controlled her mental illness. R. 932–33.

In February 2020, plaintiff reported her depression was getting a bit better, she still had auditory hallucinations, and some small panic attacks where she became shaky and sweaty, but these only lasted a minute at most. R. 935. Her sleep and energy were good and her concentration had improved with Zoloft. *Id.* She still worked part-time and was attempting to get her driver's license reinstated. *Id.* Following plaintiff's mental status examination, Dr. McCanon noted auditory hallucinations and constricted affect, but that plaintiff's mood was "better," she had fair eye contact, and otherwise normal findings. *Id.* Dr. McCanon continued plaintiff on Zoloft, which she noted partially controlled plaintiff's mental illness. R. 936.

In May 2020, Dr. McCanon treated plaintiff by telephone due to COVID. R. 939. Plaintiff reported that she still had down days, but her depression was improving overall. *Id.* She continued to worry, but with no panic attacks. *Id.* Her concentration and sleep were good and she had experienced no auditory hallucinations recently. *Id.* Following a mental status examination, Dr. McCanon noted all normal findings. *Id.* She continued plaintiff on Zoloft and found plaintiff's depression remained "well controlled" on medication. R. 939–40.

### b.    Melanie Wolf, CSB Counselor

Melanie Wolf, plaintiff's CSB case manager, met with plaintiff in September 2019, December 2019, and March 2020. R. 943, 953, 967–70. Counselor Wolf also spoke with plaintiff over the phone on three occasions between January 2020 and April 2020 to monitor her progress. R. 950–51, 955.

In September 2019, counselor Wolf noted plaintiff was unemployed, living at the Union Mission, and had difficulty establishing a support system. R. 943. Plaintiff was alert, oriented, pleasant, and engaging. *Id.*

In December 2019, plaintiff reported that she began renting a room in October through the Second Chances program, she was medication compliant, using public transportation, working part-time cleaning, and volunteering at a thrift shop. R. 967–68. During telephone calls in January and February 2020, plaintiff indicated she was medication compliant, had no mental health symptoms, continued to work 5:00 p.m. to 8:30 p.m., and "[a]ll is good." R. 950–51.

In March 2020, counselor Wolf met with plaintiff at plaintiff's residence. R. 953. She noted plaintiff had a blunted affect and minimal eye contact. *Id.* Plaintiff reported medication compliance, good sleep and appetite, and no increase in mental health symptoms. *Id.* Plaintiff continued to perform part-time janitorial work and volunteer at a thrift shop, and she had obtained her driver's license. R. 953, 969. Plaintiff indicated in a telephone call in April 2020 that she was maintaining her housing and employment, and was medication compliant with no new mental health symptoms. R. 955.

In a May 2020 telephone call with LaShawnda Lane, a case manager with CSB, plaintiff reported that she did not need medication refills, and that she had a reliable ride to pick up her medications. R. 959. Plaintiff stated, "I have found a new place to live, that I love. It's affordable and safe for me." *Id.* "This place is peaceful. . . . I am taking all of my med[ication]s correctly and they are making me feel better." *Id.*

3.     *State Agency Mental Health Consultative Examination*[5]

In November 2017, Kathleen Dring, Psy.D., conducted a consultative psychological evaluation of plaintiff. R. 865–73. Dr. Dring prepared a psychology report and a medical source statement. *Id.*

In the psychology report, she summarized plaintiff's history as reported by plaintiff during the evaluation (educational, work, family, legal, social, substance abuse, and emotional illness), as well as medical reports she received from the Hampton/Newport News CSB, including a mental status evaluation by Peter Smith, M.D., and a psychotherapy report from Nerine Pete, L.P.C. R. 866–68. Dr. Dring conducted a mental status evaluation, explaining:

> [Plaintiff] knew the correct month, day, and year. She was able to immediately recall 3 objects and after a 3 minute delay, she could recall 2 of the 3 objects. Her attention and focus were adequate enough to spell a five letter word backwards. She became somewhat loose in her associations when she was asked to interpret a common proverb. It was very difficult for her to verbalize the correct interpretation and she tended to talk around it. Her general fund of information is adequate. She was able to do a simple arithmetic problem in her head involving making change. She endorsed symptoms of depression such as insomnia. She stated during the night she will "toss and turn." She endorsed having some symptoms of depression and negative thinking, low self-esteem and lack of interest in things she used to enjoy. She states she is always "stressed out about her son."
>
> [Plaintiff's] memory, for short-term and long-term recall are intact. She was able to read and complete a preliminary disability questionnaire. It should be noted on this questionnaire there were numerous spelling errors. Her handwriting was legible indicating adequate fine motor skills.

R. 868. Dr. Dring found plaintiff's statements were "generally consistent" with one another and

---

[5] On August 24, 2015, Richard S. Hoffman, M.D., conducted a consultative examination of plaintiff. R. 571–73. Dr. Hoffman noted that plaintiff reported depression for the previous five years secondary to multiply family issues, but nothing was ever prescribed and she stopped seeing the doctor she was talking to about this (a doctor originally seen for issues related to a motor vehicle accident) when she lost her insurance. R. 571. Dr. Hoffman listed depression along with history of cervical and shoulder strain under his "Impression" section. R. 572. After listing plaintiff's functional limitations, Dr. Hoffman stated, "[t]here may be some limitations based on her mental health issues but I am unable to quantify those further at this time." R. 573.

the report submitted by the CSB.  *Id.*

Dr. Dring concluded plaintiff was "capable of performing simple and repetitive tasks," and "capable of accepting instructions from supervisors."  R. 869.  Due to her schizoaffective disorder, however, Dr. Dring found plaintiff would have:  (1) significant difficulty performing detailed and complex tasks; (2) minor difficulties maintaining regular attendance; (3) moderate difficulties performing work activities on a consistent basis; (4) moderate difficulties completing a normal work day or work week without interruptions;  and (5) moderately severe difficulties dealing with the usual stresses encountered in the competitive workplace.  *Id.*  She would also have moderate difficulties interacting with coworkers and the public due to her hallucinatory symptoms from her schizoaffective disorder, as well as her paranoia.  *Id.*

Dr. Dring diagnosed "schizoaffective disorder, depressive type"; "cocaine use disorder, severe, in sustained remission per patient report"; "opioid use disorder, severe, in sustained remission per patient report"; and a "provisional diagnosis for posttraumatic stress disorder based on allegations of sexual abuse as a child."  *Id.*  Dr. Dring recommended continued treatment through the CSB and plaintiff's primary care physician.  *Id.*

In a medical source statement attached to her psychology report, Dr. Dring checked boxes to indicate similar restrictions—on a 5-point scale of none, mild, moderate, marked, and extreme——resulting from plaintiff's mental impairments.  R. 871–72.  With respect to plaintiff's ability to carry out work-related mental activities, Dr. Dring assessed plaintiff as having: (a) mild restriction in her ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; (b) moderate restriction in her ability to understand and remember complex instructions, respond appropriately to usual work situations and to changes in a routine work setting, and interact appropriately with the public, supervisors, and co-workers; and

(c) marked restriction in her ability to carry out complex instructions and make judgments on complex work-related decisions due to "ongoing auditory hallucinations as well as impaired thinking." *Id.* Dr. Dring explained that plaintiff "easily becomes paranoid, and misinterprets peoples actions/behaviors" and "her ability to maintain pace of work may be negatively impacted by her hallucinations and paranoia." R. 872.

### 4.     *State Agency Physician Review*

On August 31, 2015, Howard Leizer, Ph.D., a state agency consultant, reviewed plaintiff's medical record. R. 120–21. Dr. Leizer found plaintiff's affective disorders resulted in no restrictions of activities of daily living, no difficulties in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation. R. 121. He noted that, although plaintiff reported depression, she was asymptomatic on exam, had robust activities of daily living, and had not been prescribed medication to treat her mental health issues. *Id.* Dr. Leizer concluded that plaintiff's mental impairments were not severe on August 31, 2015, and reached the same conclusion when he reconsidered plaintiff's medical record on November 25, 2015. R. 121, 136. Both of Dr. Leizer's reviews of the record occurred prior to plaintiff first seeking mental health treatment in 2016.

## III.   **THE ALJ's DECISION**

To evaluate plaintiff's claim of disability,[6] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ

---

[6] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any

considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her RFC; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 21–34.

The ALJ found that plaintiff met the insured requirements[7] of the Social Security Act through September 30, 2018, and had not engaged in substantial gainful activity from January 1, 2015, her alleged onset date of disability. R. 21.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) right knee mild osteoarthritis; (b) left knee disorder with medial joint line compartment chondromalacia, grade 3; (c) mild to moderate cervical degenerative disc disease; (d) obesity; (e) schizoaffective disorder; (f) depressive disorder; and (g) anxiety disorder. *Id.* The ALJ classified plaintiff's other impairments, including hypertension, coronary artery disease, left carotid bulb vascular calcification, cocaine and opiate use disorder, high cholesterol, GERD, allergies, and osteoarthritis in the hands as nonsevere.[8] *Id.* The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 21–22.

───────────────

other substantial gainful activity that exists in the national economy. *Id.*

[7] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[8] Due to the lack of objective evidence, the ALJ also found that plaintiff's bipolar disorder (apart from schizoaffective disorder), PTSD, schizophrenia, rheumatoid arthritis, hip osteoarthritis, carpal tunnel syndrome, and fibromyalgia were not medically determinable impairments. R. 21

The ALJ next found that plaintiff possessed an RFC for light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to the limitations that she: (a) avoid overhead work activity; (b) avoid climbing ladders, ropes, and scaffolds and perform other postural movements on an occasional basis; (c) "is limited to simple, routine and low stress task[s] with low stress defined as requiring work with no more than occasional change in the routine and work that allows her to avoid fast-paced tasks such as assembly line jobs involving production quotas"; (d) is limited to occasional brief and superficial interaction with the public and coworkers; and (e) is limited to frequent fingering, grasping, handling, and reaching. R. 24.

At step four, the ALJ found that plaintiff could not resume working as a phone solicitor. R. 32. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, high school education, work experience, and RFC, that plaintiff could perform other jobs available in the national economy, such as a housekeeping cleaner, garment sorter, and price marker. R. 32–33.

Accordingly, the ALJ concluded plaintiff was not disabled from January 1, 2015, through August 19, 2020, and was ineligible for a period of disability or DIB or SSI. R. 34.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of

16

"more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.    ANALYSIS

Plaintiff seeks a remand arguing that the ALJ improperly assigned the medical opinion of the consultative examiner, Dr. Dring, moderate weight. Pl.'s Mem. in Supp. of Soc. Sec. Appeal ("Pl.'s Mem."), ECF No. 19, at 9–18. Specifically, plaintiff argues the ALJ's findings—that certain of Dr. Dring's statements were vague, that Dr. Dring overstated certain of plaintiff's limitations, and that recent records were inconsistent with the opinion—were erroneous. *Id.* at 11–18. Due to such errors, plaintiff contends that the ALJ's decision is unsupported by substantial evidence, and the case should be remanded for further proceedings. Pl.'s Reply to Def.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 23, at 1, 4.

The Commissioner argues that the ALJ properly evaluated Dr. Dring's opinion, articulated

sufficient reasons for assigning it moderate weight, and substantial evidence supports the decision.

Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."),

ECF No. 22, at 13–19.

### A.   *The SSA's methodology for considering medical opinions for claims filed before March 27, 2017, applies to this case.*

The SSA revised its medical evidence rules for claims filed on or after March 27, 2017.[9]

82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017)

(correcting technical errors in final rule).  Plaintiff filed her applications for SSI and DIB in 2015,

and the medical evidence rules for claims filed prior to March 27, 2017, apply to her case.

For claims filed before March 27, 2017, the ALJ must explain the weight assigned to *all*

opinions, including treating sources, non-treating sources, state agency consultants, and other non-

examining sources.  20 C.F.R. §§ 404.1527, 416.927.  When assigning weight, an ALJ considers

the following factors:  (1) the examining relationship, giving more weight to sources who have

examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the

treatment relationship; (3) supportability, based upon the extent of the evidence presented in

support of the opinion; (4) consistency with the record; and (5) the specialization of the physician.

20 C.F.R. §§ 404.1527(c), 416.927(c) (also noting ALJ's obligation to "give good reasons . . . for

---

[9] The revised regulations dispensed with the treating physician rule.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 255–56 (4th Cir. 2017).  The SSA also rescinded Social Security Ruling ("SSR") 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996), discussing how to weigh treating source opinions. 82 Fed. Reg. 15263-01, at 15263 (Mar. 27, 2017) (noting that, for claims filed on or after March 27, 2017, "adjudicators will not assign a weight, including controlling weight, to any medical opinion"); 82 Fed. Reg. 16869-02 (Apr. 6, 2017) (corrective notice noting recission effective date of March 27, 2017); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

the weight" given to a treating source opinion); *see Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251,

256 (4th Cir. 2017) (noting that the first two factors are "specific to treating sources," while the

latter three apply to evaluating medical opinions from both treating and non-treating sources). "[I]f

a physician's opinion is not supported by clinical evidence or if it is inconsistent with other

substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

> A reviewing court:

> face[s] a difficult task in applying the substantial evidence test when the
> [Commissioner] has not considered all relevant evidence. Unless the
> [Commissioner] has analyzed all evidence and has sufficiently explained the weight
> he has given to obviously probative exhibits, to say that his decision is supported
> by substantial evidence approaches an abdication of the court's "duty to scrutinize
> the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

**B.     Substantial evidence supports the ALJ's assignment of moderate
         weight to Dr. Dring's opinion.**

The ALJ considered and summarized the report and opinions of Dr. Dring who examined

plaintiff on one occasion in November 2017 in her role as a state agency consultative examiner.

R. 28, 31.   Subsequently, the ALJ assigned moderate weight to the opinion finding some portions

consistent with, and supported by, the record, and other parts not consistent with, or supported by,

the record.   R. 31.   The Court notes that the ALJ assigned no weight to the state agency

psychological consultant's opinion that plaintiff had no severe mental impairments, the only other

opinion in the record with respect to plaintiff's mental health. R. 30.   The ALJ then crafted an

RFC that accounts for the majority of Dr. Dring's findings. R. 24.

First, the ALJ agreed with Dr. Dring's opinion that plaintiff can perform simple and

repetitive tasks and would have difficulty performing detailed and complex tasks, finding these

conclusions consistent with plaintiff's treatment, mental status exams, and activities. R. 31. The ALJ found Dr. Dring's other statements regarding plaintiff's limitations to be "vague," stating "it is unclear what specific limitations would correspond to her opinion of moderate, moderately severe, and marked limitation." *Id.* The ALJ next found that some of Dr. Dring's statements "seem to overstate [plaintiff's] limitations." *Id.* By way of example, the ALJ noted plaintiff has been able to work part-time and has been cooperative with her mental health care providers "suggesting no significant limitation in her ability to interact with supervisors," which is inconsistent with Dr. Dring's finding that plaintiff has moderate limitations interacting appropriately with supervisors. *Id.* Last, the ALJ found that recent records "show improvements in [plaintiff's] mental impairments." *Id.* For these reasons, the ALJ assigned Dr. Dring's opinion moderate weight. *Id.* The Court finds no error in the ALJ's assignment of moderate weight to Dr. Dring's opinions on plaintiff's mental impairments.

### 1.   The ALJ found that some of Dr. Dring's statements were vague.

The ALJ found Dr. Dring's statements that were unrelated to plaintiff's ability to perform simple, repetitive, detailed, or complex tasks to be "vague," stating "it is unclear what specific limitations would correspond to her opinion of moderate, moderately severe, and marked limitation." R. 31.

While acknowledging that vagueness is a permissible ground for discounting a medical opinion, plaintiff asserts that the ALJ's "insinuation that Dr. Dring's opinion was vague, was erroneous and based purely on the ALJ's poor review of the evidence." Pl.'s Mem. 11–12 (citing *Wesley v. Kijakazi*, No. 1:20cv364, 2021 WL 4129234, at *11 (M.D.N.C. Sept. 9, 2021)). Plaintiff argues that "moderate," "severe," and "marked" are terms commonly used in determining the extent of mental impairments. Pl.'s Mem. 12. Plaintiff further asserts that Dr. Dring clarified

plaintiff's mental limitations in a check-the-box form that provided clear definitions for each level of severity. *Id.* (citing R. 871–73).

The Commissioner argues that the ALJ's finding of vagueness draws support from "the form that Dr. Dring completed, which does not identify the specific functional limitation in the different areas of mental functioning." Def.'s Mem. 15 (citing R. 871). The Commissioner notes that, despite any vagueness, the ALJ acknowledged the assessment and reasonably translated the findings into more specific limitations in the RFC. *Id.*

The Court agrees with plaintiff that the areas of mental functioning scored on the check-the-box medical source statement cannot fairly be described as "vague." *See* R. 871–73. Certain opinions contained in Dr. Dring's psychology report, however, are not as easily translated into specific limitations in the RFC, and discounting the opinion due to the vagueness of the findings is appropriate. *See* R. 865–69.

For example, Dr. Dring opines plaintiff would have "minor difficulties maintaining regular attendance." R. 869. The use of "minor" does not directly translate to the categories defined on the medical source statement. *See* R. 871. Plaintiff faults the ALJ for failing to include the limitation in the RFC or explain why he discounted the limitation in his discussion of Dr. Dring's opinion. Pl.'s Mem. 17–18 (citing R. 31, 869). Although the ALJ "should articulate how [he] consider[s] *medical opinions*" the regulations do not "require written analysis about how [the ALJ] considered each *piece of evidence*." 82 Fed. Reg. 5844-01 at 5858 (emphasis added). Merriam-Webster defines minor as "inferior in importance, size, or degree; comparatively unimportant." Merriam-Webster Online Dictionary (2022). As Dr. Dring's opinion does not define the term minor and the term indicates that the limitation is comparatively unimportant, the Court cannot

find the ALJ erred by not incorporating this finding in the RFC.  Further, this portion of Dr. Dring's opinion can fairly be described as vague.

Dr. Dring also specifically notes in the psychology report that plaintiff "is capable of accepting instructions from supervisors," but would have "moderate difficulties interacting with coworkers and the public."  R. 869.  On the medical source statement, however, Dr. Dring placed three x-marks indicating plaintiff would be moderately restricted in interacting appropriately with the public, coworkers, and supervisors.  R. 872.  This discrepancy causes confusion regarding Dr. Dring's opinion with respect to plaintiff's limitation in interacting with supervisors.

While the Court is not persuaded that a large portion of Dr. Dring's opinion is vague, there are certain aspects of the report that lack clarity.  Moreover, vagueness is just one of several reasons relied upon by the ALJ to discount Dr. Dring's opinion to one entitled to moderate weight.  R. 31.

> **2.   The ALJ found Dr. Dring's opinion regarding plaintiff's ability to interact with supervisors was inconsistent with, and not supported by, the record.**

The ALJ found that some of the statements in Dr. Dring's opinion overstate plaintiff's limitations.  *Id.*  By way of example, the ALJ noted, with respect to Dr. Dring's opinion that plaintiff would be moderately limited in her ability to interact appropriately with supervisors, R. 872, the "evidence indicates that [plaintiff] has been able to work part-time and has been cooperative on exam with her mental health care providers, suggesting no significant limitation in her ability to interact with supervisors."  R. 31.

Plaintiff argues that she would rarely interact with people while performing her janitorial job, which started at 5:00 p.m. after offices are closed, and lasted for two to three hours.  Pl.'s Mem. 12–13.  She asserts this does not indicate an ability to interact with supervisors on a full-time basis.  *Id.* at 13.  Plaintiff further argues that an ability to cooperate with mental health care

professionals is not indicative of an ability to interact appropriately with supervisors. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)).

The Commissioner points out the discrepancy between Dr. Dring's specific notation in the psychology report that plaintiff "is capable of accepting instructions from supervisors," and the medical source statement indicating she would be moderately restricted in interacting appropriately with supervisors. Def.'s Mem. 16 (citing R. 869, 872, 878). The Commissioner asserts the ALJ reasonably considered that plaintiff's part-time janitorial work was going well, *id.* (citing 929, 935, 393, 968), and that her providers consistently described plaintiff as cooperative on examination, *id.* (citing R. 690, 708, 735, 924, 929, 932–33), when weighing the finding regarding her ability to interact with supervisors.

As noted above, Dr. Dring's opinions in the psychology report and medical source statement regarding plaintiff's interaction with supervisors are not consistent. Further, the fact that plaintiff does not interact with the public when performing her janitorial work in the evenings does not translate to her not interacting with supervisors. Plaintiff is presumably subject to some supervision while performing this part-time work, and the ALJ could reasonably weigh the fact that plaintiff consistently reported that her work was going well when determining plaintiff's ability to interact with supervisors. R. 31. Further, while plaintiff's ability to interact with health care workers is not overly persuasive evidence of her ability to interact with supervisors, it was not error for the ALJ to consider that plaintiff is consistently reported to be pleasant and cooperative during her mental evaluations when weighing Dr. Dring's opinion. *Id.* The ALJ appropriately considered record evidence in finding Dr. Dring overstated plaintiff's limitations with regards to interacting with supervisors.

### 3.   The ALJ found Dr. Dring overstated plaintiff's limitations in light of recent treatment notes showing improvement in plaintiff's symptoms.

Lastly, the ALJ discounted Dr. Dring's opinion because "recent records . . . show improvements in [plaintiff's] mental impairments." *Id.* (citing R. 910–75). Plaintiff asserts this "characterization" of plaintiff's recent mental health record is "inaccurate." Pl.'s Mem. 16. Plaintiff cites to notes from a CSB counselor in September 2019 indicating plaintiff had symptoms of depression and anxiety and that her mental health symptoms caused a significant impact on her social and occupational functioning. *Id.* at 15 (citing R. 914, 918–19). Plaintiff further cites to plaintiff's evaluation by Dr. McCanon in October 2019, who diagnosed depressive, anxiety, and panic disorders and noted plaintiff's mental health issues had an adverse impact on her ability to participate in employment, as well as maintain employment and housing. *Id.* at 15–16 (citing R. 922, 924–25).

The Commissioner counters by noting several treatment records between November 2019 and March 2020 showing plaintiff's gradual improvement and stability. Def.'s Mem. 16–17 (citing R. 887, 929–30, 932–33, 935–36, 939–40). The Commissioner argues there is "ample" record evidence to support the ALJ's finding. *Id.* at 17.

Substantial evidence in plaintiff's mental health treatment records from 2016 through 2020 supports the ALJ's finding that "recent records show improvement" in her impairments. R. 31. Although plaintiff's alleged onset date is January 1, 2015, the record indicates that she first sought mental health treatment in 2016. R. 687–88. She was diagnosed with schizoaffective disorder, prescribed medication, and began therapy. R. 689–91. Plaintiff suffered some setbacks, which had an impact on her mental health. Shortly after plaintiff began her mental health treatment, she was incarcerated from March through October 2016, and she lost her housing when her brother

and sister were evicted in September 2019. R. 707, 915. In treatment records from November 2019 through May 2020, however, plaintiff reported her depressive symptoms and mood were getting better, she had fewer or no panic attacks, and her concentration had improved. R. 929–30, 935, 939, 950–51, 953, 959. Plaintiff also reported in May 2020 that she had no auditory hallucinations recently, something she had experienced since she was a teenager. R. 689, 939. Plaintiff's Zoloft prescription was increased to 200 mg in November 2019, and no further changes were made to her medication through the last treatment records in May 2020. R. 930, 933, 936, 940. Plaintiff reported no side effects from the medication, that she was medication compliant, and that the medication was helping. R. 930, 933, 936, 940, 955, 959. Over this same time period, Dr. McCanon transitioned from noting that plaintiff's medications partially controlled her mental illness to noting in May 2020 that her depression "remains well controlled on medication." R. 930, 933, 936, 940. Substantial evidence supports the ALJ's finding that these more recent records evidenced improvement in plaintiff's mental impairments.

### 4. Finding moderate limitations in some areas of mental functioning does not necessarily preclude work.

Plaintiff asserts the limitations outlined in Dr. Dring's opinion, which are supported by her examination notes and consistent with other evidence in the record, indicate that plaintiff is unable to meet the mental demands of unskilled work. Pl.'s Mem. 16–17 (citing Social Security Regulation 85-15).

The Commissioner argues plaintiff's statement that Dr. Dring's assessment precludes unskilled work is "mere speculation." Def.'s Mem. 18. The Commissioner points out that Dr. Dring's medical source statement defines "moderate" as a "fair" ability to perform the mental function. *Id.* (citing R. 871; 20 C.F.R. Pt. 404, Subpt. P, app'x 1, § 12.00(F)(2)). As a result, the

Commissioner argues there is no discrepancy between Dr. Dring's assessment of moderate limitations and the ALJ's RFC finding that plaintiff could perform a limited range of simple work. *Id.*

The Social Security Regulation relied upon by plaintiff to argue Dr. Dring's assessment precludes unskilled work provides, in relevant part:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

Social Security Ruling ("SSR") 85-15, 45 Fed. Reg. 55566, 1998 WL 56857, at *4 (Aug. 20, 1980).

In the medical source statement, Dr. Dring assessed plaintiff with a "mild" restriction in her ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. R. 871. The form defines "mild" as indicating that plaintiff's ability to perform the activity "independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.*; *see also* SSA Program Operations Manual Systems ("POMS") DI 34001.032 (explaining that the SSA evaluates mental functioning on a five-point scale consisting of none, mild, moderate, marked, and extreme, and defining these ratings as they are defined in Dr. Dring's medical source document). Dr. Dring assessed plaintiff with "moderate" restrictions in her ability to understand and remember complex instructions, respond appropriately to usual work situations and to changes in a routine work setting, and interact appropriately with the public, supervisors, and co-workers. R. 871–72. The form defines "moderate" as indicating that plaintiff's ability to perform the activity "independently, appropriately, effectively, and on a

sustained basis is fair." *Id.* Dr. Dring's assessment that plaintiff's ability to perform these mental functions is fair or slightly limited, does not equate to a finding of "[a] *substantial* loss of ability to meet any of these basic work-related activities" precluding unskilled work. *Id.*; SSR 85-15 (emphasis added). Accordingly, plaintiff's argument that the limitations contained in Dr. Dring's opinion necessarily preclude all work is not persuasive.

> ### 5. The ALJ addressed the relevant factors when assigning Dr. Dring's opinion moderate weight.

In addition to providing good reasons for assigning moderate weight to Dr. Dring's opinion, the ALJ properly considered the appropriate regulatory factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ acknowledged that, as a state agency consultative examiner, Dr. Dring examined plaintiff on one occasion in November 2017. R. 28, 31. Consultative examiners such as Dr. Dring do not constitute treating sources under the regulations. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ also noted that Dr. Dring is a doctor of psychology. R. 31.

The ALJ outlined plaintiff's mental health treatment since it began in 2016. R. 27–30. The ALJ noted plaintiff's treatment with psychotropic medication and therapy for schizoaffective disorder with paranoia and hallucinations, depression, and anxiety with panic attacks. *Id.* The ALJ outlined plaintiff's mental status examinations and mental health progress notes, including her consultative examination. R. 28–29, 31. The ALJ discussed plaintiff's activities, including her part-time janitorial work and volunteer work. R. 29. The ALJ pointed out that there was "no indication from her medical records that she has had problems with her supervisors at work," noting plaintiff's report in September 2019 that she was a "nice" person who tried to be fair and not show a lot of anger. *Id.* The ALJ assigned no weight to the state agency psychological consultant's opinion that plaintiff had no severe mental impairments, finding the opinion

inconsistent with the extensive mental health treatment records and consultative psychological examination. R. 30. Following this, the ALJ summarized Dr. Dring's findings and explained (as detailed above) his reasons for assigning the opinion moderate weight.

Further, having afforded the opinion moderate weight, the ALJ accounted for many of the limitations outlined by Dr. Dring when crafting the RFC: (1) limiting plaintiff to simple, routine tasks is consistent with Dr. Dring's opinion plaintiff could perform simple and repetitive tasks and would have difficulty with detailed and complex tasks; (2) limiting plaintiff to occasional, brief, and superficial interaction with the public and coworkers is consistent with Dr. Dring's opinion that plaintiff is capable of accepting instructions from supervisors and has moderate difficulties interacting with coworkers and the public; and (3) limiting plaintiff to low stress tasks requiring no more than occasional change in the routine and not fast-paced tasks is consistent with Dr. Dring's opinion that plaintiff had moderate difficulties performing work activities on a consistent basis and moderately severe difficulties dealing with the usual stresses encountered in the competitive workplace. R. 31, 869, 878.

Although plaintiff disagrees with the weight the ALJ assigned to Dr. Dring's opinion, the ALJ considered the evidence and sufficiently explained his assignment of moderate weight to Dr. Dring's opinion. Substantial evidence supports the ALJ's decision and the resulting RFC.

## VI.    RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 18) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 21) be **GRANTED**.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 3, 2022